IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

THOMAS WINTER,

              Petitioner,             No. CIV S-05-543 KJM EFB P

     vs.

A.K. SCRIBNER,

              Respondent.          <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

       Petitioner, a state prisoner proceeding through counsel, filed this action seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges the constitutionality of his 2001 convictions and resulting sentence for robbery and first degree felony murder with special circumstances.  Petitioner contends that: (1) the trial court violated his constitutional rights by admitting into evidence at his trial a statement from petitioner that was obtained during a custodial interrogation in which he was not properly advised of his right to remain silent and in which his attempts to stop the interrogation were ignored; (2) the evidence admitted at trial was insufficient to support each of his convictions; and (3) the jury was improperly instructed at trial

1

regarding the requisite concurrence of petitioner's criminal acts and intent.  Upon careful

consideration of the record and the applicable law, and for the reasons set forth below, the

undersigned recommends that petitioner's application for habeas corpus relief be denied.

**I.  Procedural Background**

In 1997, a Shasta County Superior Court jury found petitioner guilty of first degree

murder and robbery.  It also found true the allegations that petitioner used deadly weapons (a

truck and a tire iron) in the commission of the offense, that he inflicted great bodily injury on the

victim, and that he committed the murder during a robbery and while lying in wait.  Dckt. 38-1

(hereinafter "*Winter I*") at 1-2.  Petitioner filed an appeal in the California Court of Appeal for

the Third Appellate District, which reversed his convictions because the trial court had

improperly admitted statements he made before being advised of his rights, as required by

*Miranda v. Arizona*, 384 U.S. 436 (1966).  *Id.*  The appellate court concluded that petitioner was

in custody, and should have received *Miranda* warnings, "at the moment the officers rebuffed

[petitioner's] second oral request to leave," and that all statements between that time and the

time petitioner received the *Miranda* warnings should have been excluded at petitioner's trial.

*Id.* at 19.  The court declined to rule on whether petitioner's post-*Miranda* statements "or other

evidence derived from the *Miranda* violation" would be admissible at any retrial.  *Id.*

Petitioner was retried in 2001.  Prior to the retrial, petitioner filed a motion to suppress all

of his statements to police.  Resp.'s Lodg. Doc. No. 9, Clerk's Transcript on Appeal (hereinafter

CT), at 279-92.  Therein, petitioner argued that his statements made *prior* to the time the officers

rebuffed his second oral request to leave should be excluded from the retrial because those

statements were also custodial.  *Id.* at 284-85.  He argued that his post-*Miranda* statements

should also be excluded because the police ignored his repeated assertions of the right to remain

silent.  *Id.* at 288-92.

In ruling on this motion, the trial judge first concluded that he was bound by the prior

decision of the California Court of Appeal (*Winter I*) with regard to when petitioner was "in

custody" for purposes of the *Miranda* decision.  Resp.'s Lodg. Doc. 8, Reporter's Transcript on

Appeal (hereinafter RT), at 51-52.  Thus, he ruled that all of petitioner's statements made prior

to the time the officers rebuffed his second oral request to leave were admissible at the retrial.

*Id.*  With respect to petitioner's post-*Miranda* statements, the trial judge defined the relevant

issue as follows: "was the waiver a product of a coercive interview prior to the admonition which

would deprive Mr. Winter of the free exercise of his will in deciding whether to waive his

privilege against self-incrimination."  *Id.* at 102.  The trial judge found that because the

interrogation, in general, was "non-coercive" and "very low key," petitioner's *Miranda* waiver

was valid.  *Id.* at 102-03.  The judge further found that petitioner's post-*Miranda* statement, "I

mean, that's all I have to say on the whole thing" was not an unequivocal invocation of his right

to remain silent.  *Id.* at 103-05.  Accordingly, at the retrial, the trial court admitted into evidence

that portion of petitioner's police interrogation that occurred before petitioner was "in custody,"

as determined by the California Court of Appeal in *Winter I*, as well as the portion that occurred

during and after the *Miranda* warnings.  Resp.'s Lodg. Doc. 10.[1]

    After the retrial, the jury again convicted petitioner of first degree murder and robbery,

found true the special circumstance of murder during the course of a robbery, and found true

allegations that petitioner inflicted great bodily injury and used a deadly weapon (the tire iron).

Resp.'s Lodg. Doc. 1 (hereinafter *Winter II*) at 2.[2]  The jury found not true allegations that

---

[1] Resp.'s Lodg. Doc. 10 comprises the transcript of petitioner's police interrogation that was edited and played for the jury at petitioner's retrial.  As the state appellate court noted, the videotape of petitioner's interrogation was retranscribed for the retrial with the offending (post-custody, pre-*Miranda*) portion redacted.  *Winter II* at 12.

[2] The California Court of Appeal for the Third Appellate District issued two reasoned opinions in petitioner's case: one after petitioner's original trial and one after his retrial.  The first opinion will be referred to herein as "*Winter I*" and the second opinion will be referred to as "*Winter II*."  To the extent *Winter II* referred back to and incorporated the reasoning of *Winter I* and/or the trial court's decision, this court will apply the AEDPA standards to the conclusion of those opinions as well.  *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (if the last reasoned decision on a claim adopts or incorporates the reasoning from a previous state court decision, a federal habeas court may consider both decisions to fully ascertain the meaning of the last decision).

1   petitioner used the truck as a deadly weapon and that he had lain in wait for the victim.  *Id.*  As a

2   result, petitioner was sentenced to a state prison term of life without the possibility of parole plus

3   one year.  *Id*.

4         Petitioner again appealed his convictions and sentence to the California Court of Appeal

5   for the Third Appellate District.  *Id*.  On September 17, 2003, the appellate court denied

6   petitioner relief and affirmed his convictions and sentence.  *Id*. at 27.  Petitioner then filed a

7   petition for review in the California Supreme Court, which was summarily denied on December

8   23, 2003.  Resp.'s Lodg. Doc. 7.

9         Petitioner's federal habeas petition was received for filing by this court on March 21,

10   2005.  Dckt. 1.  Respondent filed an answer on August 16, 2005.  Dckt. 8.  On March 10, 2010,

11   this court issued an order appointing counsel for petitioner and, in the same order, requested that

12   both parties file supplemental briefing on the following issues:

13         a.  Whether one or more of petitioner's pre-*Miranda* statements amounted to an
           invocation of the right to remain silent, and if so, whether petitioner exhausted
14         any such claim;

15         b.  Whether one or more of petitioner's post-*Miranda* statements amounted to an
           invocation of the right to remain silent;
16
17         c.  Whether petitioner's *Miranda* waiver and/or post-*Miranda* statements were
           involuntary; and

18         d.  Whether petitioner's post-*Miranda* statements were inadmissible under
           *Oregon v. Elstad*, 470 U.S. 298 (1985) and/or *Missouri v. Seibert*, 542 U.S. 600
19         (2004).

20   Dckt. 15.  Petitioner filed his supplemental brief on April 3, 2011.  Dckt. 38.  On June 22, 2011,

21   respondent filed his supplemental responsive brief, and on August 2, 2011, petitioner filed a

22   reply.  Dckts. 44, 48.

23   ////

24   ////

25   ////

26   ////

## II.     Factual Background[3]

Viewing the evidence in favor of the verdict, [petitioner] and [his friend and co-defendant Christopher Wachniuk] drank with [the victim, Dennis Howell] in a tavern, convinced him to leave with them to buy drugs, then robbed and killed him.

A debtor of Howell's paid him $80 on October 16, 1996, and saw Howell had a wad of bills, about $200 worth.  A videotape from the Castle Lounge tavern shows Howell entered at 7:18 that evening.  He told an off-duty bartender he had just been paid and he seemed happy.  He displayed a "stack" of money.

The kitchen manager of Kona's restaurant was on a billiards team which was going to play the Castle Lounge team at 7:30.  He saw [petitioner] and Wachniuk at Kona's at about 6:30 drinking a pitcher of beer.  Although one of the two agreed to play in the tournament on the Kona's team, neither showed up at the Castle Lounge on time.  They had said they were reluctant to play *because they had no money.*  Later he gave them $5 (enough for two beers) for belatedly showing up.

A Castle Lounge regular customer testified [petitioner] or Wachniuk asked him outside to smoke marijuana, but he declined.  Another regular customer became concerned because Howell's drinking companions did not seem like friends.  Howell seemed drunk, but they did not.  At times "[t]hey seemed like they were whispering and talking to each other without him being aware of what they were saying.  I was kind of concerned about that."  "They were kind of laughing, and it wasn't like they were laughing with him, it was like they were laughing at him."  At one point Howell called [petitioner] a "peckerwood," but Howell explained he was joking and it seemed like the men were joking about it.  Detective Paul Grooms testified he had since learned that "peckerwood" is a term associated with "white pride" and can be offensive.  Later, Howell asked the second regular customer if he wanted to smoke marijuana, but this regular, too, declined.  Howell asked him to tell the barmaid to put his pitcher "on ice, that he would be right back," at about 8:52.

The Castle Lounge barmaid knew Howell well and although he could become "loud and boisterous" he did not cause problems and "was a nice guy.  He was a fun guy."  [Petitioner] and Wachniuk nursed one bottle of beer each that evening, and also shared Howell's pitcher.  [Petitioner] and Wachniuk never left Howell alone, and when they spoke just with each other, they seemed to be conferring, rather than talking.  When she noticed the three men

_____

[3]  This factual background is taken from the unpublished opinion of the Third District Court of Appeal and is presumed correct.  *See* 28 U.S.C. § 2254(e)(1).

had left, she was surprised to see Howell's pitcher partly full of beer on the counter; Howell rarely left beer unconsumed.

[Petitioner] and Wachniuk went to the Bell Lounge around 9:30 or 10:00 that night and stayed for perhaps an hour.  They were nervous and bought several drinks (mostly doubles) in that time, always paying with $20 bills.  At one point Wachniuk had his arm around [petitioner] and told him to shut up a couple of times.  After that, the barmaid told them she would not serve them more drinks.  They still tipped her lavishly.

Meanwhile, a girl had found Howell's corpse on a road near the local dump at about 9:00 that night.  A sheriff's deputy arrived shortly thereafter.  The body was not very cold and the deputy thought "the person there wasn't deceased for very long."  He thought it was strange there were *two* pools of blood in the road, about three feet apart, "but I didn't see any drag marks in the blood, for instance.  My conclusion was that the body must have been at rest and bleeding at this pool of blood to the south, and then somehow got moved from there to here while it was still bleeding."

A seasoned CHP officer concluded Howell was driven over at slow speed; it was not a hit-and-run accident.  In his opinion the victim "was driven upon by a vehicle and the vehicle sat upon him for a short period of time and then accelerated off of him."

Howell's head had taken at least five blows, possibly by a tire iron.  The hands had defensive wounds.  The body was crushed, "everything was shifted or kind of like squeezed off to one side."  His blood-alcohol level was .23 percent.

[Petitioner] voluntarily went to the Redding police station on October 22, 1996, where Detectives Grooms and Damon Minor questioned him.  [Petitioner] first claimed he and Wachniuk left the bar alone.  Later he said a man asked for drugs but he and Wachniuk "just left."  The man "was basically bein' pretty cool."  [Petitioner] later admitted agreeing to give the man a ride to get some marijuana, but after the man used "pecker-wood," "White Pride stuff," "we let him out an' then we left."  The officers *Mirandized* [petitioner] and he then explained that Howell became belligerent, they fought, Howell went down, then Wachniuk took his wallet out of his pants *before* the man was accidentally run over.  However, [petitioner] admitted that when they were at the bar, Howell told them "he had some money" and [petitioner] and Wachniuk planned to "'roll him'" or that Wachniuk said "'Let's roll this guy.'"  [Petitioner] also said "I'm gonna do a lot of time, I'm the one that killed him," and said he hit Howell with a tire iron "a couple of times in the head" and in the body, *after Howell was down*. [emphasis in original]

6

Officers found the tire iron in [petitioner's] garage and [petitioner's] truck had human blood on it, possibly Howell's.

Neither [petitioner] nor Wachniuk testified at trial. The defense theory at trial was Wachniuk was the "instigator," all three men were "very intoxicated" and the victim started a fight which got out of hand, followed by the "tragic accident" in which the victim was run over.

*Winter II*, at 2-6.

## III.  Analysis

### A.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. *See Wilson v. Corcoran*, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the state court decision. *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (*citing Williams v. Taylor*, 529 U.S. 362, 405-06

1    (2000)).  Nonetheless, "circuit court precedent may be persuasive in determining what law is

2    clearly established and whether a state court applied that law unreasonably."  *Stanley*, 633 F.3d

3    at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010))

4         A state court decision is "contrary to" clearly established federal law if it applies a rule

5    contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

6    precedent on "materially indistinguishable" facts.  *Price v. Vincent*, 538 U.S. 634, 640 (2003).

7    Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant

8    the writ if the state court identifies the correct governing legal principle from the Supreme

9    Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[4]

10   *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360

11   F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ

12   simply because that court concludes in its independent judgment that the relevant state-court

13   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

14   application must also be unreasonable."  *Williams*, 529 U.S. at 412.  *See also Schriro v.*

15   *Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal

16   habeas court, in its independent review of the legal question, is left with a 'firm conviction' that

17   the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit

18   precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness

19   of the state court's decision."  *Harrington v. Richter*, 562 U.S.___,___, 131 S. Ct. 770, 786

20   (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a

21   condition for obtaining habeas corpus from a federal court, a state prisoner must show that the

22   state court's ruling on the claim being presented in federal court was so lacking in justification

23   that there was

24   _____

25        [4] Under § 2254(d)(2), a state court decision based on a factual determination is not to be
     overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
26   presented in the state court proceeding."  *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011)
     (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

1    an error well understood and comprehended in existing law beyond any possibility for

2    fairminded disagreement."  *Richter*, 131 S. Ct. at 786-87.

3           If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

4    court must conduct a de novo review of a habeas petitioner's claims.  *Delgadillo v. Woodford*,

5    527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

6    (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

7    § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

8    considering de novo the constitutional issues raised.").

9           The court looks to the last reasoned state court decision as the basis for the state court

10   judgment.  *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

11   If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

12   previous state court decision, this court may consider both decisions to ascertain the reasoning of

13   the last decision.  *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When

14   a federal claim has been presented to a state court and the state court has denied relief, it may be

15   presumed that the state court adjudicated the claim on the merits in the absence of any indication

16   or state-law procedural principles to the contrary."  *Richter*, 131 S. Ct. at 784-85.  This

17   presumption may be overcome by a showing "there is reason to think some other explanation for

18   the state court's decision is more likely."  *Id*. at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797,

19   803 (1991)).  Where the state court reaches a decision on the merits but provides no reasoning to

20   support its conclusion, a federal habeas court independently reviews the record to determine

21   whether habeas corpus relief is available under § 2254(d).  *Stanley*, 633 F.3d at 860; *Himes v.*

22   *Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo

23   review of the constitutional issue, but rather, the only method by which we can determine

24   whether a silent state court decision is objectively unreasonable."  *Himes*, 336 F.3d at 853.

25   Where no reasoned decision is available, the habeas petitioner still has the burden of "showing

26   there was no reasonable basis for the state court to deny relief."  *Richter*, 131 S. Ct. at 784.

1    When it is clear, however, that a state court has not reached the merits of a petitioner's

2    claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

3    habeas court must review the claim de novo.  *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462

4    F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook,* 333 F.3d 1052, 1056 (9th Cir. 2003).

5    **B.  Petitioner's Claims**

6        Petitioner claims he is entitled to federal habeas relief because: (1) the state trial court

7    erred in admitting statements he made during a custodial interrogation in which he was not

8    properly advised of his right to remain silent and his efforts to invoke his right to remain silent

9    were ignored; (2) there was insufficient evidence to support his convictions for robbery, felony

10   murder, and a robbery special circumstance, and (3) the jury instructions provided to the jury at

11   his trial improperly defined the required concurrence of act and intent.  Pet., Attach. at 1, 2.  The

12   court will address these claims in turn below.

13   **1.  Admission of Petitioner's Statements**

14       In his habeas petition filed on March 21, 2005, petitioner claims that the trial court

15   violated his constitutional rights by admitting into evidence statements he made during his

16   custodial interrogation after he was given his *Miranda* warnings.  He argues that the post-

17   *Miranda* questioning and statements were "not based upon an independent, voluntary decision

18   made by petitioner to waive his rights, but [were] made in the same interrogation immediately

19   after [he gave an] unwarned confession, and thus [were] the product of the violation and not a

20   free, knowing and voluntary waiver of his right to remain silent because of the coercive

21   conditions which led up to the waiver."  Dckt. 1 at 7-8.  Petitioner contends that "[t]he post-

22   *Miranda* statements and questioning all refer[red] to the pre-*Miranda* confession [which the state

23   appellate court held was inadmissible], and in essence were merely a continuation of the un-

24   advised statement rather than a new confession made after being fully advised and being fully

25   able to determine whether to talk to the officers."  *Id.* at 8.  Petitioner further argues that his post-

26   ////

1   *Miranda* statements were inadmissible because he indicated that he wanted the interrogation to

2   cease and his statements were ignored.  *Id.*

3          In the answer, respondent counters that petitioner's pre-*Miranda* statements did not

4   render his post-*Miranda* statements inadmissible because his pre-*Miranda* statements were not

5   coerced.  He also argues that the state appellate court's conclusions with regard to this issue were

6   not unreasonable.  Dckt. 8 at 25-27.  Respondent further contends that even if petitioner's post-

7   *Miranda* statements should not have been admitted at trial, petitioner was not prejudiced by their

8   admission because the prosecutor had sufficient other evidence to convict petitioner of the

9   charged crimes.  *Id.* at 27-28.  In his supplemental brief, respondent notes that petitioner's post-

10  *Miranda* statements actually "bolstered his most effective defenses in this case against the most

11  serious charge, providing the only evidentiary support for his counsel's argument that he struck

12  and killed Howell only after Howell made derogatory racial comments and started a fight [], and

13  that the money was taken only after Howell was unconscious or dead."  Dckt. 44 at 56-57.

14         In *Winter II*, the state appellate court rejected petitioner's claims in a written decision on

15  petitioner's post-retrial appeal.  Prior to addressing the claims, the court quoted its earlier

16  opinion in *Winter I*, as follows:

17         At about 11:30 on the morning of October 22, 1996, [Investigator]
       Grooms and Investigator Damon Minor were serving search
18     warrants at [petitioner's] house and Wachniuk's house.  They saw
       [petitioner] and told him they were "doing an investigation.  Told
19     him he was not under arrest, he was free to go, but we would like
       to talk to him.  We asked if he would come down to the police
20     station with us, and he said he would.  And we took him up to the
       police department and the interview proceeded from there."
21     Officer Grooms admitted he had directed two other officers to
       detain [petitioner] briefly until he arrived.  [Petitioner] was not
22     restrained or handcuffed.  No officer displayed weapons.  The
       police car was unmarked.  Officers Grooms and Minor questioned
23     [petitioner] until they concluded the killing was not an accident.
       "There was no explanation for what had occurred as far as it
24     wasn't a traffic collision, it wasn't self defense, and he had made
       no effort to give any aid for this man or do anything for him.  So it
25     turned into a custodial point at that point, and Investigator Minor
       read him his rights."  [Petitioner] made no effort to leave even after
26     asking if he could leave and asking to speak with his mother;

                                    11

instead, he kept talking.

At the hearing [on petitioner's pretrial motion to suppress his inculpatory statements to police], the defense introduced into evidence a videotape and transcript of the interrogation.

The transcript reflects the following.  The officers chatted with [petitioner] about his probation for a domestic violence offense.  Then they announced they were "investigators" and wanted to talk to him because "your name came up in an investigation," but he was not under arrest.  "An' you don't have to be makin' these statements or . . . talk to us if you don't want [to].  Like for whatever reason, if at any time, if you decide that you don't want to talk to us that's fine you're free to leave.  At . . . at any time.  You're not under arrest you're here on your own free will an' . . . an' earlier you said you'd be willing to come in and talk to us."  They explained "last Wednesday night there was a guy who'd been out at a bar, and ended up in the roadway and, you know, he's deceased.  An' we don't know what happened to him."  The only reason they wanted to speak to [petitioner] (they said) was because [petitioner] had been to a bar the decedent may have been at on the night of his death.

[Petitioner] said he and his friend (codefendant Wachniuk) had played pool in the tavern that night.  He denied knowing the victim and was vague about when he was there.  He and Wachniuk used [petitioner's] truck.  [Petitioner] repeatedly said the bar was "dark" when asked if he had spoken to the victim.  [Petitioner] said he drove the truck all night.

The officers told [petitioner] it was important for him to be honest and implied some of the things he had said were not accurate . . . .  "[P]eople are tellin' us that you guys left with this guy."  "An' you know, more than one person's sayin' that, so we don't think it's a mistake[.]"

Thus, the focus of the investigation was on [petitioner], and, more importantly, the officers let [petitioner] know it.

[Petitioner] continued to deny he left with the victim, but admitted walking outside the tavern with a man who wanted to buy drugs, "An' I don't even know if it's the same guy.  An' then we got outside, and then me an' Chris just left. . . ."  He again said the bar was dark, but said the man was a "biker type like guy" who was "basically bein' pretty cool."

The officers pressed [petitioner] . . . : "Tom, Tom . . . these people are independent witnesses they don't know you, and they don't know this guy.  An' their [sic] tellin' us that you guys all left together.  So that's just not . . . it's not addin' up.  [¶] TW [petitioner]: *I just don't want no parts of this, I mean really.  I'd*

12

*like to leave if I could.*  [¶] [Officer]: Well, we've . . .  [¶] TW: But I mean I'm just . . .  [¶] [Officer]: We understand you don't want any part of it, okay?  But you . . . but you do have a part in it.  An' we . . . did you just take the guy, did you drop him off somewhere, or did you, did you . . .  You know, how – [.]  That's what we need to know.  I mean, we're not sayin' that you did anything to this guy, we're just sayin' that we know you left with him. . . ."  [Italics in original].

Thus, the officer ignored the point of [petitioner's] statement and continued to press him.  By this point, a reasonable person, told that multiple independent witnesses had undermined his story, and told that the officers believe he is lying, would understand the situation was dire.

Then the answers and questions resumed.  [Petitioner] said he had nothing to do with the victim getting hurt, but they did give him a ride.  "I don't know, I chickened out, Chris kind of chickened out," presumably, about making a drug deal with the victim.  [Petitioner] said they dropped him off because he began using offensive "White Pride" language.  When he denied there had been a fight, the officers told him "see we've been told this . . . you know, uh, it's not really a secret to us but we were told."  [Petitioner] said "I'm gonna tell you this just scares me because" he had bad luck.  Then the officers said "you're not here for no reason," and "we know a whole lot more than you think we know," and "there's things like physical evidence that you cannot explain away."  When [petitioner] said he did not know what happened at the crime scene, one officer said "But you do know what happened."

By this point, any doubt that the officers had communicated to [petitioner] that he was suspected of wrongdoing was dispelled.

The other officer then gave a long statement suggesting something went wrong, that [petitioner] had not planned it, that he was young and a good person, "Um, but somethin' happened.  And, uh, you know, to . . . to sit here and deny it, it . . . it's not doing you any good, or anybody else any good.  [¶] TW: I know, I mean.  I-I'd just like to talk to my Mom, right now, I mean . . .  [¶] [Officer]: The thing, Tom, I just want ya to understand, is that by lyin' to us, you're only gettin' in deeper in this thing.  [¶] TW: I understand that.  I know, I mean . . .  [¶] [Officer]: I already know what's . . . [¶] TW: *You know how you say, ya know, I could leave right now, on my own free will* . . . .  [¶] [Officer]: Mmm-Huh.  [Indicates Affirmative Response]  [¶] TW: . . . an' whatever . . .  [¶] [Officer]: Right.  Right.  [¶]  TW: And I mean . . .  [¶] [Officer]: But what we want ya to understand is that we're given ya only – an [sic, (or one?)] opportunity to just tell us the truth.  'Cause right now, on the outside lookin' in, I wasn't there, it looks like you're not bein' truthful with me an' maybe it was an intent – an' intentional act and not accidental, and there's a big difference.  [¶] TW: I mean, I

didn't want to hurt nobody . . . ."  (Italics added [by the first state appellate court].)

When [petitioner] asked to speak to his mother (as he had every right to do, although he was an adult, if he was, in fact, not in custody) his request was ignored.  More significantly, when he said "You know how you say, ya know, I could leave right now, on my own free will," this was *not* delivered in the tone of a person stating his understanding of his rights.  Instead, it was spoken as a plea to leave, and was a follow-up to his request to speak to his mother.  In fact, [petitioner] gestures to the door of the interrogation room when he delivers this line.  However, once again, the officers ignored his request and told him he had "an," singular, or "one" chance to tell the truth. . . .

Again, the answers and questions continued.  After a short while, an officer suggested the victim pulled a knife: "TW: [Inaudible], I don't know . . . you know.  [¶] [Officer PG]: But we need to hear it from you, I mean, Y-ya know you're here for, uh, now, for a reason.  We know a lot that's gone on, okay?  And, uh . . [.]  [¶] TW: *Can I just leave, an' like* . . .  [¶] [Officer PG]: . . . so . . . what we . . . So what we're . . . what we're talking . . .  [¶] TW: . . . *talk later, I mean* . . .  [¶] [Officer PG]: What?  We-We've gotta talk now Tom.  This is . . .  this is serious stuff . . .  [¶] TW: I know.  [¶] [Officer PG]: We gotta talk now.  We've gotta find out, you know. We need to know, your story, and Chris'[s] story, okay?  [¶] [Officer DM]: See what's . . . the way these things generally work is we only give you one opportunity to tell us what happened.  And this is your chance.  Either you're gonna tell us the truth or else, we're gonna build a case on physical evidence an' witness statements.  [¶] [Officer PG]: Mmm-Huh.  [Indicates Affirmative Response]  [¶] [Officer DM]: An' then your statement after the fact is not gonna mean much.  You've already been . . . right now you're not under arrest, you got an opportunity to tell us what happened.  We already know what happened."  (Italics added [by the first state appellate court].)

The officers implied Wachniuk was at the station and had spoken with them already.  [Petitioner] said he was scared.  The officers suggested a scenario where the victim was drunk and belligerent and began making racist comments which angered [petitioner]. [Petitioner] replied "That's basically, how it was."  He repeated that he was scared, but continued to answer questions.  He said the victim was unpleasant "An' then he went to say things about me an' then we got out, an' then I tried to leave, an' got it . . . I clipped him with the truck."  The victim said things about "me bein' a Mexican."

At this point in the interrogation, [petitioner] began to cry, but he continued to answer questions.  He said they went to the dump to sell the victim drugs, but he admitted they did not have any drugs

to sell.  Then he described a fight which knocked the victim down, after which [petitioner] ran over him by accident, "Just tryin' to get out real quick."  [Petitioner] begins crying more vigorously at this point, both as reflected by the reporter's notations on the transcript and more vividly by the videotape.  [Petitioner] describes the sounds of driving over the body, and said he did not look back and did not try to get medical aid for the victim.  After describing the fight again, [petitioner] asked to call his mother and asks if he can leave.  At that point, the officers read the *Miranda* admonitions.

After hearing his right to remain silent, [petitioner] continued to speak to the officers, giving more details about the crime. . . .  [¶] . . . [¶]

The test [for custody] is whether there was a restraint of person similar to an arrest, and inquires whether, viewed objectively, a reasonable person would have felt free to leave.  (*People v. Ochoa* (1998) 19 Cal.4th 353, 401-402.)  Relevant factors to consider are the location of the interrogation, the length and manner of the questioning, indicia of arrest, and whether the officers let the suspect know they have focused the investigation on him.  (*People v. Stansbury* (1995) 9 Cal.4th 824, 830; *People v. Boyer* (1989) 48 Cal.3d 247, 272 [as clarified by *Stansbury*].)

. . . Although [petitioner] never physically rose to leave, his repeatedly-expressed desire to leave and the refusal of the officers to honor or even acknowledge his request would suggest to a reasonable person that he could not leave.  Accordingly, [petitioner] was the subject of restraint equivalent to a formal arrest and his motion to preclude the People from using statements he made during the interrogation should have been granted. . . .  [¶] . . . [¶]

Here the officers confronted [petitioner] by suggesting they had spoken with his codefendant and others who, by implication, told them something different than what [petitioner] had told them.  They communicated to him that he was the focus of their investigation.  More importantly, although they never said he was not free to leave, as in *People v. Aguilera* [(1996)] 51 Cal.App.4th 1151, they repeatedly discounted or ignored his comments about his ability to leave.  His first comment was brushed aside.  When [petitioner] later reminded the officers they had said he could leave, he was told he had only one chance to tell the truth.  In a third passage, when [petitioner] unequivocally asked if he could leave and talk later he was met with "What?  We-We've gotta talk now Tom.  This is . . . serious stuff . . . ."

Another critical fact is [petitioner] was "held," as he puts it, by peace officers at the scene of the search for a few minutes until the investigating officers arrived.  Thus, although he was later *told* he was free to leave, the entire course of interaction with the police

15

began with a detention; thereafter, whenever [petitioner] tried to invoke the offer to terminate the questioning by leaving, the officers ignored his requests.

A reasonable person who is detained at the scene of a search, held for other officers, transported to a police station, questioned pointedly and made to understand he is the focus of the investigation, and whose request to leave is ignored, would feel he was not free to leave.

The Attorney General does not make a harmless error argument and on this record we see no basis upon which to find the error harmless beyond a reasonable doubt. [Citation.]

The trial court had no need to consider whether [petitioner's] post-*Miranda* statements or other evidence derived from the *Miranda* violation would be admissible in the case-in-chief notwithstanding exclusion of the prior statements.  Neither party on appeal discusses the point.  For clarification in the event the People pursue this point on retrial, we hold custody attached at the moment the officers rebuffed [petitioner's] second oral request to leave. [Citation.] By then a reasonable person would not have felt free to go.

*Winter II* at 6-12.

The court in *Winter II* then went on to explain its rejection of petitioner's claims, as follows:

[Petitioner] also argued [his] post-*Miranda* statements should be excluded because the officers ignored his requests to stop the interrogation and refused to allow him to speak to his mother, thereby sapping his will to invoke his rights.  To answer these points we set out facts from the interrogation retranscription, which was evidence at the in limine hearing on [petitioner's] suppression motion on retrial.

After the *Miranda* warnings, [Investigator] Minor asked [petitioner] if he would answer more questions and he agreed.  After discussing the proposed sale of marijuana to Howell and how the trio ended up near the dump, [petitioner] said Howell had been "an asshole" and that [petitioner] was "sorry for everything." [Investigator] Grooms said there was more to the story and [petitioner] said he did not intend to hurt Howell.  He then said Wachniuk had taken the wallet and it "got thrown" while [petitioner] was driving and the two men split the money. [Petitioner] freely described the fight and how he ran over Howell.  He then said "That's really all I have to say on the whole thing.  I mean[.] . . ."  Minor told [petitioner] he and Grooms had to write everything down and be accurate and asked him to "just tell us

16

what happened . . . how the accident happened" and they could write it down accurately. [Petitioner] replied that "me and Chris didn't intend to really like, nothin' like this, okay?" and he continued to answer questions. When Minor asked if the truck had dragged Howell, [petitioner] said he did not know "I mean that's all I have to say on the whole thing." But when Minor followed up by asking if Wachniuk had told him to drive over Howell, [petitioner] said no and continued to answer questions without protest. After a while the officers told [petitioner] he could not leave and an ambiguous passage followed: After [petitioner] asked, "Can I call my Mom?" Minor replied "Yeah, uh-huh" and continued that the officers were going to call the DA, but most likely "that's not gonna happen," which appears to be an answer to [petitioner]'s *penultimate* question "I'm not gonna be able to leave, am I?" rather than to the question about his mother. Grooms said they would not lie to [petitioner] (about the seriousness of his plight) and Minor said "But, yeah, we will let" but was cut off: Most likely he was continuing his earlier thought that "Yeah, uh-huh" [petitioner] would eventually be able to call his mother. This seems to be how [petitioner] took the statement because a short while later [petitioner] asked "Can I call my Mom now, please." Minor suggested that *Grooms* make some calls and [petitioner] agreed; while Grooms was gone, Minor continued to ask questions. Grooms came back to say he would make some calls and Minor said "Okay. And then we'll let you call your Mom, okay?" and asked for the woman's name. Minor then led [petitioner] through his story again, and after a few pages mentioned search warrants, whereupon [petitioner] said: "Can I please let my Mom . . . talk to my Mom before you guys do everything 'cause it'll freak her out. It's gonna freak her out anyways but . . . I'd rather be the one to tell her." Thus his concern was *not* ending the conversation until he could get his mother's help, but a concern *for his mother's state of mind* if search warrants were served without warning by the police. The officers continued to ask questions about such things as [petitioner]'s act of cleaning his truck and clothing. They deflected his "Mom" requests a couple more times. Eventually, Minor told [petitioner] the officers had to finish the searches before he could call his mother, because sometimes people try to destroy evidence.

Based largely on this transcript the trial court concluded the post-*Miranda* statements were admissible because the interview was not coercive, [petitioner] understood his rights and continued to speak with the officers, making no unequivocal statement that he wished to stop talking. (See *Oregon v. Elstad* (1985) 470 U.S. 298 [84 L.Ed.2d 222] (*Elstad*).) The trial court expressed the view that the question was close: "I do this with great trepidation, of fearing to be referred to as a learned trial judge by the Third District Court of Appeal, but . . . that's my ruling." We will not refer to the trial judge as "learned." The interview was not coercive and the officers did not ignore any invocation of the *Miranda* rights.

17

In the reply brief [petitioner] asserts "To hold that officers may violate *Miranda* with impunity as long as they advise the suspect and he continues to discuss his confession, will open a Pandora's box and lead the way to making the advisement requirement meaningless." Although [petitioner] uses different imagery, the rule he invokes is at bottom the "cat out of the bag" theory which arose in the context of *coerced* prior confessions (*United States v. Bayer* (1947) 331 U.S. 532, 540-541 [91 L.Ed. 1654, 1660]) and which does not apply to *Mirandized* confessions which follow prior unwarned confessions: "[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion.  A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." (*Elstad, supra,* 470 U.S. at p. 314 [84 L.Ed.2d at pp. 235-236]; see *People v. Wash* (1993) 6 Cal.4th 215, 241.)

The trial court viewed the interrogation tape and determined the questioning was "very low key," albeit at times the officers told [petitioner] they knew he was involved, and at times lied about what evidence they had already collected.  Accusing a suspect and pretending to have evidence against him are standard interrogation techniques and do not of themselves indicate that a suspect's will has been overcome.  The fact officers continue to question a suspect after the point of custody does not infer that they did so with the intention of violating *Miranda*.  As the prosecutor pointed out at argument on the suppression motion, the question when custody attaches during an interrogation is often a difficult one, as demonstrated by the fact that the appellate panel in *Winter I* disagreed on that fact, yet "they [courts] expect police officers to make those judgment calls . . . ."  So far as the record shows, when the officers did (subjectively) believe they had Winter in custody, they *Mirandized* him.

[Petitioner's] opening brief relied heavily on Ninth Circuit cases which had been superseded by that court in the en banc decision of *U.S. v. Orso* (9th Cir. 2001) 266 F.3d 1030 (*Orso*).[5]  Orso was questioned while in custody and made highly incriminating statements.  Later she was *Mirandized* and confessed.  (*Id.* at pp. 1032-1033.)  The court applied the rule, derived from *Elstad*, that "even though the earlier statement from the suspect was elicited in violation of *Miranda*, so long as the earlier statement was not involuntary due to unconstitutional coercion, the subsequent, voluntary, warned statement was still admissible, without regard to whether it was 'tainted' by the earlier statement."  (*Id.* at p. 1035.)

---

[5]  *Orso* has since been abrogated by *Missouri v. Seibert*, 542 U.S. 600 (2004) and *United States v. Williams*, 435 F.3d 1148 (9th Cir. 2006).  See discussion below.

The *Orso* court disavowed a prior decision which had departed from *Elstad* by concluding that deliberate police tactics of violating *Miranda* and then reading the *Miranda* warnings to get a warned confession could preclude the use of the subsequent confession, even if those tactics did not amount to unconstitutional coercion, that is, did not produce an *involuntary* confession. (*Id.* at pp. 1036-1039.)  Thus *Orso* instead applied the traditional test of coercion, that is, involuntariness. (*Id.* at pp. 1039-1040.)  As stated by the concurrence, "To be voluntary, a confession must be 'the product of a rational intellect and a free will.' [Citation.]  In addition to the pressures inherent in custodial interrogation, other factors can compromise the free will of an accused.  Officials cannot extract a confession 'by any sort of threats or violence, nor . . . by any direct or implied promises, however slight, nor by the exertion of any improper influence.' [Citations.]  Courts do not require physical injury before finding an interrogation unconstitutional.  '[M]ore sophisticated modes of "persuasion"' may suffice.  [Citation.]  Neither physical intimidation nor psychological pressure is permissible."  (*Id.* at pp. 1041-1042 (conc. opn.; see *People v. Cahill* (1993) 5 Cal.4th 478, 485.)

Applying this test, we agree with the trial court that [petitioner's] decision to speak with the officers after receipt of the *Miranda* warnings was voluntary.  The officers made no express or implied threats or promises.  Although [petitioner] would obviously have preferred not to reveal his culpability, he continued to answer their questions freely.  He did so "perhaps from . . . the natural psychological relief arising from telling the truth." (1 Witkin, Cal. Evidence (4th ed. 2000) Hearsay, § 65, p. 755.)  Telling a suspect he should be honest and explain what happened does not amount to coercion.  (*Id.* at pp. 755-756.)

We also reject [petitioner's] contention the officers disregarded his *Miranda* right to stop the interrogation.  Under Proposition 8 we apply the federal standard of invocation, whereby a suspect must *unambiguously* invoke his rights, such as by demanding counsel or clearly articulating that the interview must cease.  (*People v. Crittenden* (1994) 9 Cal.4th 83, 129-130; *see Davis v. United States* (1994) 512 U.S. 452 [129 L.Ed.2d 362].)  We must consider the purported invocations in context and give weight to the trial court's finding of no invocation.  (*People v. Peracchi* (2001) 86 Cal.App.4th 353, 359-360 (*Peracchi*).)

[Petitioner] states the officers ignored his requests to speak with his mother.  There is no right of an adult in custody to speak with his mother (*People v. Soto* (1984) 157 Cal.App.3d 694, 704-705) and [petitioner's] requests to do so did not unambiguously convey the idea that he did not want to answer the officer's questions:  Indeed, [petitioner] continued freely to answer their questions, demonstrating he did *not* so intend his request.  Moreover, as the People point out, Detective Grooms testified he did not allow

19

> [petitioner] to call his mother because the police were serving
> search warrants and feared [petitioner] might signal his mother to
> destroy evidence; indeed, [petitioner] was given this reason during
> the interrogation.  This undermines his suggestion the officers
> wanted to cut [petitioner] off from outside aid.

> [Petitioner] did say he had said "all I have to say on the whole
> thing."  This does not equate to "I refuse to say more."  [Petitioner]
> points to a case holding "'I don't want to discuss it right now,'"
> was an invocation.  (*Peracchi, supra,* 86 Cal.App.4th at p. 361.)
> But *Peracchi* emphasizes that the context of invocations must be
> considered, and on the facts, as soon as he was *Mirandized,*
> Peracchi said he did not want to talk.  (*Id.* at pp. 358-360.)  Here,
> [petitioner] immediately *waived* his rights and never unequivocally
> asked that the questions stop.

> We conclude there was no *Miranda* violation on retrial.

*Winter II* at 14-21.

In his supplemental brief filed on April 3, 2011, petitioner argues that the trial court erred in admitting his pre **and** post-*Miranda* statements at the retrial, and that the state appellate court's decision upholding the admission of these statements is contrary to and an unreasonable application of *Oregon v. Elstad,* 470 U.S. 298 (1984) "and its progeny."  Dckt. 38 at 2. Petitioner first argues that the police used an improper "two-step" interrogation procedure, whereby they deliberately interrogated petitioner without giving *Miranda* warnings until he confessed, and then gave the warnings and asked him to confess again.  *Id.*  He contends that the mid-stream *Miranda* warnings were "a tactic to circumvent *Miranda.*"  *Id.* at 13.  He notes that the same investigators questioned petitioner both prior to and subsequent to the *Miranda* warnings, that there was no break between the two phases of questioning, and that the "warned interrogation fully overlapped with and drew upon the complete confession obtained during the unwarned phase."  *Id.* at 2, 13.  Petitioner argues that these factors "demonstrate that the two-step interrogation in this case was a deliberate tactic and that the belated *Miranda* warnings were not effective to overcome the taint from the unwarned confession."  *Id.*

////

20

1    Petitioner further argues that this court should "review the holding in *Winter I* concerning

2  the point when [petitioner's] interrogation became custodial." *Id.* at 11.  He argues that the

3  decisions in *Winter I* and *Winter II* unreasonably applied *Miranda* when they held that petitioner

4  was not in custody during the initial part of his interrogation.  *Id.* at 3.  Petitioner contends that

5  he was in custody "from the moment the interrogation commenced." *Id.*  Therefore, according to

6  petitioner, none of his statements prior to the *Miranda* warnings should have been admitted at

7  the retrial.  *Id.*  Petitioner notes that the court in *Winter I* concluded that "the entire course of

8  [petitioner's interrogation] began with a detention" because petitioner was held by a police

9  officer at the police station until the investigating officers arrived.  He argues, "the *Winter I*

10  court's holding that the 'entire course' of the interaction began with a detention cannot be

11  reconciled with it's [sic] conclusion that Winter was not in custody until he had been

12  interrogated for a lengthy period." *Id.* at 12.  Petitioner contends that a reasonable person in his

13  position would have understood that he was not at liberty to terminate the interview and leave, at

14  any point during the interrogation.  *Id.*

15    Petitioner also contends that his entire confession was involuntary; therefore, none of his

16  statements to police should have been admitted at his retrial.  He argues that the police

17  "employed threats and promises;" implied that he would face a lesser punishment if he admitted

18  his guilt; warned him that the interrogation was his only chance to make a statement; and ignored

19  his requests to stop the interrogation, to leave, and to speak with his mother.  *Id.* at 3.  In short,

20  petitioner argues that both his pre- and post- *Miranda* statements to police were "custodial and

21  involuntary" and were therefore inadmissible pursuant to *Elstad*.  *Id.*

22    Finally, petitioner argues that admission of his statements into evidence at the retrial was

23  prejudicial pursuant to *Brecht v. Abrahamson*, 507 U.S. 619 (1993) and *Arizona v. Fulminante*,

24  499 U.S. 279 (1991).  *Id.*  He claims that his confession "was the centerpiece of the

25  prosecution's proof of [petitioner's] participation in the killing and was crucial to the

26  prosecutor's argument that his offense was first-degree murder with special circumstances, rather

than a lesser degree of homicide." *Id.* at 3-4.

**a. Petitioner's pre-Miranda Statements**

As described above, at petitioner's retrial the trial court admitted into evidence petitioner's statements made between the commencement of the interrogation and the point at which *Winter I* held that petitioner was "in custody" (when "the officers rebuffed [petitioner's second oral request to leave"). *Winter I* at 19. Petitioner argues, however, that he was "in custody" from the moment the interrogation began, and not just after his second oral request to leave; therefore, his statements to police prior to being advised of his constitutional rights should have been excluded in their entirety. Dckt. 1 at 7; Dckt. 38 at 11. Petitioner contends that a reasonable person would not have believed he was free to leave the interrogation where, as here: (1) he was detained at the police station until the interrogating detectives arrived; (2) the police were serving search warrants on his home and the home of his co-defendant while he was being interrogated; (3) he was transported to the station by the detectives and questioned in the formal, police dominated atmosphere of the police station by those same two detectives; (4) the detectives told petitioner they thought he was involved in the death of Howell early in the interrogation; and (5) the detectives told petitioner that "he was the focus of the investigation into Howell's death and that he would undermine his own interests if he did not admit his involvement." *Id.* Petitioner argues that, because he was "in custody" from the beginning of the interrogation, all of his statements made before he received *Miranda* warnings should have been excluded from his retrial. Dckt. 38 at 12-13; Dckt. 48 at 2-6.

Petitioner raised this same claim on appeal after his retrial. Resp.'s Lodg. Doc. 2 at 17.

////

////

////

////

////

1    He argued that:

2            . . . this court should reconsider its ruling from the prior appeal as
             to the time that [petitioner] was in custody for *Miranda* purposes.
3            Such reconsideration should take into account those cases
             interpreting the *Miranda* standard to require consideration of the
4            objective circumstances of the interrogation as they would appear
             to a reasonable person and not simply from the time when
5            [petitioner] finally articulated that he had realized that he was not
             free to go.

6

7    *Id.*  The state appellate court rejected this argument in *Winter II*, reasoning as follows:

8            We identified [in *Winter I*] when custody attached by page and line
             of the transcript.  Defendant's statements made before "the
9            moment the officers rebuffed defendant's second oral request to
             leave" (*Winter I, supra*, typed opn. at p. 18) were admissible
10           because the *Miranda* line of cases applies to and only to *custodial*
             interrogations.  Statements made after then, but before the *Miranda*
11           warning were *inadmissible*.  Statements made *after* the *Miranda*
             warning might or might not be admissible.  The videotape was
12           retranscribed for the retrial with the offending (post-custody, pre-
             *Miranda*) portions redacted.

13
             However, [petitioner] moved in limine to exclude *all* statements he
14           made the day of the interrogation.  Based partly on acontextual
             snippets from *Winter I*, [petitioner] argued the *pre*-custody
15           statements should have been excluded, on the theory that he was in
             custody "from the moment Officer Canning asked him to stay at
16           the scene to speak with Investigators Minor and Grooms."  This
             argument defied our holding in *Winter I*, which defined the
17           moment custody attached and which is law of the case.  The trial
             court ruled: "I'm not going to be an idiot.  The [C]ourt of [A]ppeal
18           is going to wonder what in the world is wrong with Judge
             McEachen that he doesn't understand the law of the case.  I'm
19           bound; and counsel shouldn't try to argue something - there are
             few things that are black and white in the law.  This is one of the
20           black and white matters."  Nonetheless, appellate counsel asks us
             to reconsider our prior decision about when custody attached.  We
21           decline to do so: Judicial economy would be frustrated, and there
             has been no change in the law which justifies departing from the
22           general rule that legal points decided in prior appeals bind
             subsequent proceedings.  (citations omitted).

23

24   *Winter II* at 13.

25          In *Miranda*, the United States Supreme Court held that the Fifth Amendment privilege

26   against self-incrimination prohibits the admission into evidence of statements given by a suspect

                                                     23

1   during "custodial interrogation" without a prior warning.  384 U.S. at 444.  *See also Stanley v.*

2   *Schriro*, 598 F.3d 612, 618 (9th Cir. 2010) (*Miranda* warnings are required only where the

3   suspect is "in custody").  Custodial interrogation means "questioning initiated by law

4   enforcement officers after a person has been taken into custody or otherwise deprived of his

5   freedom of action in any significant way."  *Miranda*, 384 U.S. at 444.  Whether a suspect is "in

6   custody" for purposes of *Miranda* requires application of an objective test.  *J.D.B. v. North*

7   *Carolina*, ___ U.S. ___, 131 S.Ct. 2394, 2402 (2011); *Yarborough v. Alvarado*, 541 U.S. 652,

8   662-63 (2004).  Two inquiries are necessary for a determination of an individual's "in custody"

9   status under this test: (1) what were the overall circumstances surrounding the interrogation; and

10  (2) given those circumstances, would a reasonable person in the suspect's situation have felt free

11  to terminate the interrogation and leave.  *J.D.B.*, 131 S.Ct. at 2402; *Yarborough*, 541 U.S. at 662-

12  63; *Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *Stansbury v. California*, 511 U.S. 318, 322

13  (1994).

14          The question before this court is whether the California Court of Appeal applied *Miranda*

15  in an objectively unreasonable manner when it concluded that petitioner was not "in custody"

16  until the police detectives rebuffed his second request to leave.  In making this determination,

17  this court is bound by the following general guidelines:

18          The term "'unreasonable'" is "a common term in the legal world
            and, accordingly, federal judges are familiar with its meaning."
19          (citation omitted.)  At the same time, the range of reasonable
            judgment can depend in part on the nature of the relevant rule.  If a
20          legal rule is specific, the range may be narrow.  Applications of the
            rule may be plainly correct or incorrect.  Other rules are more
21          general, and their meaning must emerge in application over the
            course of time.  Applying a general standard to a specific case can
22          demand a substantial element of judgment.  As a result, evaluating
            whether a rule application was unreasonable requires considering
23          the rule's specificity.  The more general the rule, the more leeway
            courts have in reaching outcomes in case-by-case determinations.

24

25  *Yarborough*, 541 U.S. at 663.  "The custody test is general."  *Id.* at 665.  Accordingly, the state

26  court had "more leeway" in determining whether the circumstances indicated petitioner was "in

                                                  24

1  custody" during his interrogation.  In addition, this court may not grant habeas relief on this

2  claim so long as 'fairminded jurists could disagree' on the correctness of the state court's

3  decision." *Richter*, 131 S. Ct. at 786.

4       Petitioner has not shown that the state court's ruling as to when the questioning became

5  custodial was contrary to or an unreasonable application of clearly established United States

6  Supreme Court authority, or that the ruling was an unreasonable determination of the facts.  For

7  the reasons expressed by the California Court of Appeal in *Winter I*, there are objective

8  circumstances of petitioner's police interrogation that support the conclusion that petitioner was

9  not "in custody" until his second request to terminate the interrogation was rebuffed by the

10 police detectives.  Although there are factors which support petitioner's assertion that a

11 reasonable person would not have felt free to leave the interrogation from the beginning, the

12 decision of the Court of Appeal on this issue is not "so lacking in justification that there was an

13 error well understood and comprehended in existing law beyond any possibility for fairminded

14 disagreement."  *Richter*, 131 S. Ct. at 786-87.  The court notes, in this regard, that the dissenting

15 justice in *Winter I* argued that petitioner was not "in custody" until later in the interrogation,

16 when he made his third request to leave by asking "Can I just leave, an' like . . . talk later, I

17 mean."  *Winter I* at 21.  Given this difference in opinion by justices on the same appellate panel

18 with regard to when petitioner was "in custody," the conclusion of the justices in the majority

19 that petitioner was not in custody until his second request to terminate the interrogation is not

20 "unreasonable."

21      Moreover, as respondent notes, "[t]he only pre-*Miranda* statements admitted on retrial

22 consisted of Petitioner's admission that he and Wachniuk gave Howell a ride; that he and

23 Wachniuk 'chickened out' on getting Howell drugs because Howell was too 'overbearing'; that

24 Howell used 'White Pride' words like 'peckerwood' that offended Petitioner; and that he and

25 Wachniuk told Howell they would return with pot, but decided not to return after all."  Dckt. 8 at

26 20-21.  In light of the other evidence admitted at trial, including petitioner's later confessions,

25

1   which are addressed below, this court concludes that petitioner's pre-*Miranda* statements did not

2   have a substantial effect, injurious to petitioner, on the jury's decision-making process. *Brecht v.*

3   *Abrahamson*, 507 U.S. 619, 631 (1993).

4         For the foregoing reasons, petitioner's challenge to the admissibility of his pre-*Miranda*

5   statements should be denied.

6         **b. Petitioner's post-Miranda Statements**

7         Petitioner raises several arguments with regard to the admission into evidence of his post-

8   *Miranda* statements to police.  First, he argues that his post-*Miranda* statements should have

9   been excluded from the retrial under *Elstad* because "the mid-stream *Miranda* warnings were a

10  tactic to circumvent *Miranda*."  Dckt. 1 at 7; Dckt. 38 at 13.  Second, he argues that his post-

11  *Miranda* statements should have been excluded because they were involuntary.  Dckt. 1 at 8;

12  Dckt. 38 at 13.  In his original petition, petitioner raised an additional claim that his pre and post-

13  *Miranda* statements should have been excluded from his retrial because the interrogating

14  deputies ignored his repeated requests that the interrogation cease, "thus violating the central

15  protection of *Miranda* – the ability to stop the interrogation at any time."  Dckt. 1 at 8.

16  Accordingly, this court will address (1) whether petitioner invoked his Fifth Amendment right to

17  remain silent during the interrogation and, if so, whether the interrogating officers scrupulously

18  honored that invocation, (2) whether petitioner's *Miranda* waiver and subsequent confession

19  were voluntary, knowing, and intelligent (as required by the Fifth Amendment pursuant to

20  *Miranda* and as required by the due process clause of the Fourteenth Amendment), and (3)

21  whether petitioner's post-*Miranda* confession should have been excluded under *Oregon v. Elstad*

22  because of petitioner's pre-*Miranda* confession.

23  ////

24  ////

25  ////

26  ////

i.      **Did Petitioner Invoke His Right to Remain Silent?**

In his petition, petitioner argues that:

> even *before* he was advised [of his *Miranda* rights, he] indicated
> that he wanted the interrogation to cease and his statements were
> ignored.  In addition, after the advisement, additional invocations
> and attempts to stop the interrogation and to speak to his mother
> were also either ignored or rejected, thus violating the central
> protection of *Miranda* – the ability to stop the interrogation at any
> time.

Dckt. 1 at 8.  In his supplemental brief, petitioner argues that the detective "ignored his requests to stop the interrogation, to leave, and to speak with his mother."  Dckt. 38 at 3.

In *Miranda v. Arizona*, the Supreme Court held that custodial interrogations must be preceded by advice to the potential defendant that he has the right to consult with a lawyer, the right to remain silent and that anything he says can be used in evidence against him.  384 U.S. 436, 468-73 (1966).  An accused who wishes to invoke his or her right to remain silent must do so unambiguously.  *Berghuis v. Thompkins*, ___ U.S. ___, 130 S.Ct. 2250 (2010).  Simply remaining silent is insufficient to invoke the right.  *Id.* at 2259-60.  Once *Miranda* warnings have been given, if a suspect makes an unambiguous statement invoking his constitutional rights, "all questioning must cease."  *Smith v. Illinois*, 469 U.S. 91, 98 (1984).  *See also Miranda*, 384 U.S. at 473-74; *Michigan v. Mosley*, 423 U.S. 96, 100 (1975).  Any subsequent statements are relevant only to the question whether the accused waived the right he had previously invoked. *Smith*, 469 U.S. at 98.  "Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together."  *Id.*

Invocation of the right to remain silent must be construed liberally.  *See Hoffman v. United States*, 341 U.S. 479, 486 (1951).  Thus, a suspect need not rely on any special combination of words to invoke the right to silence.  *Quinn v. United States,* 349 U.S. 155, 162 (1955).  However, "[a]lthough a suspect 'need not speak with the discrimination of an Oxford don,' he must articulate his desire to [invoke his constitutional rights] sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be [an

1   invocation of his constitutional rights]." *Davis v. United States*, 512 U.S. 452, 459 (1994).  In

2   order to determine whether a suspect invoked this Fifth Amendment right, "a court should

3   examine the entire context in which the claimant spoke." *Bradley v. Meachum*, 918 F.2d 338,

4   342 (2d Cir. 1990) (quoting *United States v. Goodwin*, 470 F.2d 893, 902 (5th Cir. 1972)).

5          Petitioner does not cite to any portion of the state court record in support of this claim,

6   nor does he describe in his petition the statement or statements that he contends constituted an

7   invocation of his Fifth Amendment rights.  However, a review of the transcript of petitioner's

8   interrogation reflects that none of petitioner's statements constituted an unambiguous,

9   unequivocal request to remain silent.  Petitioner's requests to speak with his mother, under the

10  totality of the circumstances presented here, did not unambiguously convey that he wished to

11  terminate the interview.  As noted by the California Court of Appeal, it turned out that petitioner

12  was mainly concerned that his mother would find out about his involvement in the crime before

13  he could tell her.

14         The California Court of Appeal also held that petitioner's assertion that he had said "all I

15  have to say on the whole thing" was not an unequivocal assertion of the right to remain silent.

16  Although reasonable minds could differ on this question, the state court's conclusion in this

17  regard is not "so lacking in justification that there was an error well understood and

18  comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*,

19  131 S.Ct. at 786-87.  In short, a reasonable police officer could have failed to interpret these

20  remarks as a demand to terminate the entire interview.  *See Neri v. Hornbeak*, 550 F. Supp.2d

21  1143, 1164 (C.D. Cal. 2008) ("'I need to leave' is not the same as 'I have nothing to say,' and

22  'admit[s] more than one interpretation.'").  In any event, any possible ambiguity in this regard

23  would have been erased when petitioner immediately continued to discuss the matter after

24  detectives told him that he should tell the truth "now" and not later.  Petitioner's ongoing stream

25  of conversation with detectives following the alleged invocation of his right to remain silent

26  belies an intention to terminate the interview.  *See Bradley*, 918 F.2d at 342-43.

The court also notes that "[t]he protections provided by Miranda attach only when an individual is both in custody and being interrogated." *Deragon v. Alameida*, No. CIV S-02-0526 MCE JFM P, 2006 WL 572908, at *4 (E.D. Cal. Mar. 8, 2006) (citing *McNeil v. Wisconsin*, 501 U.S. 171, 182 n. 3 (1991) ("We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation"). *See also Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) (holding that an accused has the right to have counsel present during custodial interrogation)). Accordingly, any statements made by petitioner prior the time that he was "in custody" are not protected by the *Miranda* ruling.

For all of these reasons, petitioner's claim that his statements to police should have been suppressed because they were obtained after he invoked his right to remain silent should be denied.

    ii.  **Were Petitioner's *Miranda* Waiver and Post-*Miranda* Statements Knowing, Intelligent, and Voluntary?**

Petitioner argues that his post-*Miranda* statements should not have been admitted at his retrial because his waiver of his *Miranda* rights was not "free, knowing and voluntary" and was based on the "coercive conditions which led up to the waiver." Dckt. 1 at 7-8. In his supplemental brief, petitioner contends that both his statements to police and his *Miranda* waiver were invalid under *Elstad* because they were obtained through "implied promises of leniency and misrepresentations of the legal consequences of his confession." Dckt. 38 at 20. Petitioner argues that the detectives' deliberate "two-step" interrogation method undermined his ability to make a "reasoned voluntary choice to waive his rights." *Id.* at 21. He argues that the pre-*Miranda* "implied threats and promises of leniency" tainted his subsequent waiver of his rights. *Id.* Petitioner notes that, after his un-warned confession, the detectives suggested that the incident was an "accident" and not that "big of a deal." *Id.* He argues that comments such as these gave him the impression that a full and complete confession might result in a lesser charge.

////

1   *Id.*  Petitioner also argues that the detectives ignored his requests to terminate the investigation

2   and leave.  *Id.*

3        Petitioner contends that the interrogation was conducted in a coercive atmosphere.  He

4   notes that, while he was initially told his cooperation was voluntary, he was not informed that he

5   would not be allowed to speak to his mother, or anyone else, and would be held virtually

6   "incommunicado."  *Id.* at 22.  He states that he was in a closed and small interview room with

7   the interrogating detectives "inches away."  *Id.*  Further, the interrogation became increasingly

8   accusatory as the time passed.  *Id.*  He argues that the detectives "wore him down" until he

9   confessed.  *Id.*

10       Petitioner also argues that his "distraught condition" and his "youth" made him especially

11  susceptible to psychological coercion.  *Id.*  He states that he was 22 years old at the time of the

12  interrogation and is "obviously unintelligent."  *Id.* at 23.  He was also frightened, and became

13  physically ill after the interrogation was over.  *Id.*  The detective used "classic tactics,"

14  insinuating he would receive a greater punishment if he didn't cooperate and suggesting that he

15  would be treated better if he confessed.  He argues that his "mental and emotional state rendered

16  him more vulnerable to police pressure and manipulation."  *Id.* at 23-24.

17       Petitioner also argues that the police falsely suggested they had other evidence against

18  him, told him this was his one opportunity to tell his side of the story, and falsely suggested they

19  believed the killing was an "accident."  *Id.* at 23-25.  He argues that the detectives went beyond

20  misrepresenting evidence simply as a ruse, but misrepresented the legal consequences of his

21  statements to the point that he could not make a knowing and intelligent decision to waive his

22  rights.  *Id.* at 25.  Petitioner likens his situation to that in *Moore v. Czerniak*, 534 F.3d 1128 (9th

23  Cir. 2008), wherein police informed the suspect that if he confessed to "accidentally killing the

24  victim," the charges against him would "be dropped, or, more likely, reduced from murder to a

25  lesser offense."  *Id.*  The Ninth Circuit concluded in that case that this "implied promise" was

26  "sufficiently compelling to overbear [the defendant's] will."  534 F.3d at1139, n.10.  Petitioner

1   also notes that, while the detectives read him the *Miranda* warnings, they did not ask him

2   whether he was willing to "waive" or "give up" his constitutional rights, but only asked whether

3   they could ask him a few more questions.  Dckt. 38 at 26.  Petitioner argues that, in view of the

4   totality of the circumstances, his continued participation in the interrogation could not be

5   construed as a valid waiver.

6        In sum, petitioner contends that his *Miranda* waiver was invalid because it was

7   involuntary due to police coercion, in violation of the Fifth Amendment right against self-

8   incrimination, and also that his post-*Miranda* statements themselves were involuntary due to

9   police coercion, in violation of his Fourteenth Amendment right to due process.  He claims that

10  the decision of the California Court of Appeal in *Winter II* that there were no coercive police

11  tactics rendering the confession involuntary was an objectively unreasonable application of

12  federal law.

13       The Ninth Circuit recently addressed the relationship between a Fifth Amendment

14  *Miranda* analysis of an interrogation and a Fourteenth Amendment voluntariness analysis,

15  explaining as follows:

16           Although generally viewed as distinct, the [*Miranda* and
             voluntariness] doctrines originated from the same concerns. "Over

17           time, our cases recognized two constitutional bases for the
             requirement that a confession be voluntary to be admitted into

18           evidence: the Fifth Amendment right against self-incrimination
             and the Due Process Clause of the Fourteenth Amendment."

19           Whereas the Fifth Amendment by its text safeguards the individual
             against being "compelled in any criminal case to be a witness

20           against himself," the due process protection stems from the
             principle that "tactics for eliciting inculpatory statements must fall

21           within the broad constitutional boundaries imposed by the
             Fourteenth Amendment's guarantee of fundamental fairness."

22

23  *Doody v. Schriro,* 548 F.3d 847, 858-62 (9th Cir. 2008) (internal citations omitted).  Because

24  petitioner specifically challenges the voluntariness of his *Miranda* waiver, the analysis of

25  petitioner's *Miranda* claim is very similar to the analysis of his due process voluntariness claim;

26  therefore, the court will address both issues.

1     "Under clearly established federal law, a suspect who is subjected to custodial

2 interrogation must be advised of his federal constitutional right to remain silent and his right to

3 an attorney before questioning commences. *Miranda*, 384 U.S. at 444.  A defendant may waive

4 his *Miranda* rights "provided the waiver is made voluntarily, knowingly and intelligently."

5 *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *Bates v. Clark*, No. 07-CV-0330 H(BLM), 2008

6 WL 1787407, at *7 (S.D. Cal. Apr. 16, 2008).  A waiver is "voluntary" if "it was the product of a

7 free and deliberate choice rather than intimidation, coercion, or deception."  *Moran*, 475 U.S. at

8 421.  It is "knowingly and intelligently" made if the defendant had "full awareness of both the

9 nature of the right being abandoned and the consequences of the decision to abandon it."  *Id.*

10 "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an

11 uncoerced choice and the requisite level of comprehension may a court properly conclude that

12 the *Miranda* rights have been waived."  *Id.*  Although not dispositive, "[a]n express written or

13 oral statement of waiver of the right to remain silent or of the right to counsel is usually strong

14 proof of the validity of that waiver."  *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

15 "[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver [of the Fifth

16 Amendment right to remain silent] will, of course, show that the defendant did not voluntarily

17 waive his privilege."  *Miranda*, 384 U.S. at 476.

18     The Fourteenth Amendment to the United States Constitution also demands that

19 confessions be made voluntarily.  *See Lego v. Twomey*, 404 U.S. 477, 483-85 (1972).

20 Involuntary confessions may not be used to convict criminal defendants because they are

21 inherently untrustworthy and because society shares "the deep-rooted feeling that the police must

22 obey the law while enforcing the law; that in the end life and liberty can be as much endangered

23 from illegal methods used to convict those thought to be criminals as from the actual criminals

24 themselves."  *Spano v. New York*, 360 U.S. 315, 320-21 (1959).

25     In determining whether a confession is voluntary, "the question is 'whether the

26 defendant's will was overborne at the time he confessed.'"  *Haynes v. Washington*, 373 U.S. 503,

513 (1963); *see also Amaya-Ruiz v. Stewart*, 121 F.3d 486, 494 (9th Cir. 1997) (the test is

"whether . . . the government obtained the statement by physical or psychological coercion or by

improper inducement so that the suspect's will was overborne."). "The line of distinction is that

at which governing self-direction is lost and compulsion, of whatever nature or however infused,

propels or helps to propel the confession." *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir. 1991)

(en banc) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)); *see also Pollard v*

*Galaza*, 290 F.3d 1030, 1033 (9th Cir. 2002) ("Under the Fourteenth Amendment, a confession

is involuntary only if the police use coercive means to undermine the suspect's ability to exercise

his free will."); *Henry v. Kernan*, 197 F.3d 1021, 1027 (9th Cir. 1999).

"There is no 'talismanic definition of 'voluntariness'' that is 'mechanically applicable.'"

*Clark v. Murphy*, 331 F.3d 1062, 1072 (9th Cir. 2003), *overruled in part on other grounds* by

*Lockyer v. Andrade*, 538 U.S. 63 (2003) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 224

(1973)). Rather, voluntariness is to be determined in light of the totality of the circumstances.

*See Miller v. Fenton*, 474 U.S. 104, 112 (1985). This includes consideration of both the

characteristics of the petitioner and the details of the interrogation. *Schneckloth*, 412 U.S. at 226

(The court must examine "the factual circumstances surrounding the confession, assess [ ] the

psychological impact on the accused, and evaluate [ ] the legal significance of how the accused

reacted."); *see also United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003) ("Courts . . .

often consider the following factors: the youth of the accused, his intelligence, the lack of any

advice to the accused of his constitutional rights, the length of detention, the repeated and

prolonged nature of the questioning, and the use of physical punishment such as the deprivation

of food or sleep."); *Clark*, 331 F.3d at 1072; *Henry*, 197 F.3d at 1026 ("[v]oluntariness depends

on such factors as the surrounding circumstances and the combined effect of the entire course of

the officers' conduct upon the defendant").

"A confession is involuntary if coerced either by physical intimidation or psychological

pressure." *Haswood*, 350 F.3d at 1027; *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir.

1   1981) ("subtle psychological coercion suffices . . . at times more effectively 'to overbear a

2   rational intellect and a free will' ").  In the end the court must determine under the totality of the

3   circumstances whether "the government obtained the statement by physical or psychological

4   coercion or by improper inducement so that the suspect's will was overborne." *Beaty v. Stewart*,

5   303 F.3d 975, 992 (9th Cir. 2002) (quoting *United States v. Leon Guerrero*, 847 F.2d 1363, 1366

6   (9th Cir. 1988)); *see also Hutto v. Ross*, 429 U.S. 28, 30 (1976); *Haynes*, 373 U.S. at 513-14.

7          Officials cannot extract a confession "by any sort of threats or violence, nor . . . by any

8   direct or implied promises, however slight, nor by the exertion of any improper influence."

9   *Hutto*, 429 U.S. at 30 (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)).  False

10  promises or threats may render a confession invalid.  *See, e.g., Lynumn v. Illinois*, 372 U.S. 528,

11  534 (1963) (confession found to be coerced by officers' false statements that state financial aid

12  for defendant's infant children would be cut off, and her children taken from her, if she did not

13  cooperate); *Rogers v. Richmond*, 365 U.S. 534, 541-45 (1961) (defendant's confession was

14  coerced when it was obtained in response to a police threat to take defendant's wife into

15  custody); *Spano*, 360 U.S. at 323 (confession found to be coerced where police instructed a

16  friend of the accused to falsely state that petitioner's telephone call had gotten him into trouble,

17  that his job was in jeopardy and that loss of his job would be disastrous to his three children, his

18  wife and his unborn child).

19         However, "misrepresentations made by law enforcement in obtaining a statement, while

20  reprehensible, do[] not necessarily constitute coercive conduct."  *Pollard*, 290 F.3d at 1034.

21  Additionally, encouraging a suspect to tell the truth is not coercion.  *Amaya-Ruiz*, 121 F.3d at

22  494.  Nor is it coercive to recite potential penalties or sentences, including the potential penalties

23  for lying to the interviewer.  *Haswood*, 350 F.3d at 1029.

24         Finally, "[w]arnings and a waiver are not dispositive of a confession's voluntariness."

25  *Doody*, 548 F.3d at 860.  Compliance with *Miranda* does not conclusively establish the

26  voluntariness of a subsequent confession.  *Berkemer v. McCarty*, 468 U.S. 420, 433 n. 20 (1984).

1   "Moreover, when analyzing the voluntariness of a confession following *Miranda* warnings, the

2   delivered warnings, even if sufficient to satisfy *Miranda*"s prophylactic rule, must be examined

3   in detail, as they are part of the circumstances pertinent to the voluntariness inquiry." *Doody*,

4   548 F.3d at 860.

5          With those standards in mind, the court turns to the state court's analysis of the issue.

6   The California Court of Appeal addressed petitioner's voluntariness claims as follows:

7               The trial court viewed the interrogation tape and determined the
                questioning was 'very low key,' albeit at times the officers told

8               [petitioner] they knew he was involved, and at times lied about
                what evidence they had already collected.  Accusing a suspect and

9               pretending to have evidence against him are standard interrogation
                techniques and do not of themselves indicate that a suspect's will

10              has been overcome.  The fact officers continue to question a
                suspect after the point of custody does not infer that they did so

11              with the intention of violating *Miranda*.  As the prosecutor pointed
                out at argument on the suppression motion, the question when

12              custody attaches during an interrogation is often a difficult one, as
                demonstrated by the fact that the appellate panel in *Winter I*

13              disagreed on that fact, yet 'they [courts] expect police officers to
                make those judgment calls . . . .'  So far as the record shows, when

14              the officers did (subjectively) believe they had Winter in custody,
                they *Mirandized* him.

15                                            ***

16              [W]e agree with the trial court that [petitioner's] decision to speak

17              with the officers after receipt of the *Miranda* warnings was
                voluntary.  The officers made no express or implied threats or

18              promises.  Although [petitioner] would obviously have preferred
                not to reveal his culpability, he continued to answer their questions

19              freely.  He did so 'perhaps from . . . the natural psychological
                relief arising from telling the truth.'  Telling a suspect he should be

20              honest and explain what happened does not amount to coercion.

21   *Winter II* at 17-19.

22          The state appellate court's conclusion that, under the totality of the circumstances,

23   petitioner's *Miranda* waiver was voluntary is a reasonable application of federal law.  Petitioner

24   was advised of his *Miranda* rights, expressly stated that he understood them, and stated that he

25   was willing to talk to the officers.  Resp.'s Lodg. Doc. No. 10, at 31.  Petitioner then proceeded

26   to speak freely with the officers.  *See Elstad*, 470 U.S. at 318 ("The fact that [a] suspect chooses

1   to speak after being informed of his rights is, of course highly probative" as to whether his

2   confession was voluntary).  Moreover, as discussed below, and as the state court found, "the

3   questioning was 'very low key'" and "not coercive," and the officers made no promises to

4   petitioner.  Under these circumstances, petitioner has failed to demonstrate that his decision to

5   waive his *Miranda* rights was not the "product of a free and deliberate choice" and/or was made

6   without a "full awareness of both the nature of the right being abandoned and the consequences

7   of the decision to abandon it."

8          The state appellate court's conclusion that petitioner's confessions were voluntary and

9   uncoerced is also reasonable.  Based on a totality of the circumstances, and after viewing the

10  videotape of petitioner's police interrogation, this court agrees with the state court's conclusion

11  that petitioner made an independent and informed choice of his own free will to continue talking

12  and to ultimately confess, his will not being overborne by the pressures and circumstances

13  surrounding him.  Petitioner came to the interrogation voluntarily, and then spoke freely with the

14  officers.  The interrogation lasted only two hours and the conditions of his detention did not

15  appear to have had any impact on his decision to confess.  Overall, the interview was conducted

16  in a "low key" manner and the questioning was not so heavy-handed that it would have caused

17  petitioner to lose "self-direction."  Although the officers repeatedly encouraged petitioner to tell

18  the truth because it was the right thing to do and it was in petitioner's overall best interests to do

19  so, the officers did not promise or even hint that petitioner would receive any specific benefit if

20  he told the truth.  In fact, the officers informed petitioner that the outcome of the interrogation

21  would depend on many factors, including his state of mind at the time the crime took place.

22         The officers' use of some deception (for example, by telling petitioner they had physical

23  evidence that they did not have and that they had already obtained a statement from his co-

24  defendant) was not impermissible and did not amount to coercion because it was not the type of

25  police deception that is reasonably likely to produce a false confession.  *See, e.g., Frazier v.*

26  *Cupp*, 394 U.S. 731, 739 (1969) (confession admissible even though officer falsely told the

1   suspect his accomplice had been captured and confessed).  Moreover, although petitioner was

2   not advised of his *Miranda* rights at the commencement of the interrogation, the state appellate

3   court found that the officers advised petitioner of his rights as soon as they believed they had

4   him "in custody," and nothing in the record suggests that such a finding was incorrect.

5   Therefore, the delay in provision of the *Miranda* warnings in this case does not support a finding

6   that petitioner's confession was involuntary.

7       In sum, the state appellate court's conclusion that petitioner's interrogation was not

8   conducted in a coercive atmosphere and did not result in an involuntary confession is not

9   contrary to or an unreasonable application of federal authority, nor was it based on an

10  unreasonable determination of the facts.  Accordingly, petitioner is not entitled to habeas relief

11  on this ground.  *See Clark*, 331 F.3d at 1072-73 (finding a confession voluntary, even though the

12  suspect was detained in an interview room for approximately eight hours and the officer

13  expressed his opinion that a judge and jury would weigh fear of punishment against remorse, and

14  that in his opinion, remorse would outweigh the fear of punishment); *Amaya-Ruiz*, 121 F.3d at

15  494 (findings statements "we can forgive your lies, but the United States Court system will not

16  forgive your lies" and "if he wants any forgiveness, he should tell the truth" not coercive);

17  *Palaghiuc v. Evans*, No. CIV S-05-1115 RRB KJM P, 2008 WL 1767030, at *11 (E.D. Cal. Apr.

18  16, 2008) (finding a confession voluntary even though the interrogating officers falsely

19  threatened to arrest and charge the suspect's innocent friend for the crime and appealed to the

20  suspect's conscience); *Yepez v. McGrath*, No. C 04-5124 JSW (PR), 2007 WL 3146977, at *8

21  (N.D. Cal. Oct. 25, 2007) (finding the petitioner's confession voluntary, even though the

22  interrogating officers encouraged the suspect to tell the truth).[6]

23

24      [6] *Cf. Tingle*, 658 F.2d at 1336 (finding that warnings by interrogators "that a lengthy
    prison term could be imposed, that [the suspect] had a lot at stake, that her cooperation would be
25  communicated to the prosecutor, that her failure to cooperate would be similarly communicated,
    and that she might not see her two-year-old child for a while," under the circumstances,
26  constituted psychologically coercive tactics sufficient to render the suspect's subsequent
    confession involuntary); *Garvin v. Farmon*, 80 F. Supp.2d 1082, 1089 (N.D. Cal. 1999) (finding

1

                  **iii.**    **Were Petitioner's Post-*Miranda* Statements**
                                **Inadmissible under *Oregon v. Elstad*?**

2

3        In the petition, petitioner argues that his post-*Miranda* statements were inadmissible

4  under *Oregon v. Elstad*, 470 U.S. 298 (1985) because his "post-*Miranda* statements and

5  questioning all refer to [his] pre-*Miranda* confession, and in essence were merely a continuation

6  of the un-advised statement rather than a new confession made after being fully advised and

7  being able to determine whether to talk to the officers."  Dckt. 1 at 8.

8        As noted above, the state appellate court rejected this argument.  It found that because

9  petitioner's statements were voluntary, the trial court's admission of his post-*Miranda* statements

10  was not erroneous.  The appellate court construed petitioner's argument as a "cat out of the bag"

11  theory and stated that such a theory "does not apply to *Mirandized* confessions which follow

12  prior unwarned confessions: '[A]bsent deliberately coercive or improper tactics in obtaining the

13  initial statement, the mere fact that a suspect has made an unwarned admission does not warrant

14  a presumption of compulsion.  A subsequent administration of *Miranda* warnings to a suspect

15  who has given a voluntary but unwarned statement ordinarily should not suffice to remove the

16  conditions that precluded admission of the earlier statement.'"  *Winter II* at 17 (quoting *Elstad*,

17  470 U.S. at 314).  The state court concluded that "so far as the record shows, when the officers

18  did (subjectively) believe they had [petitioner] in custody, they *Mirandized* him" and petitioner's

19  "decision to speak with the officers after receipt of the *Miranda* warnings was voluntary."  *Id*. at

20  18.

21  *////*

22

23  that "falsely suggesting to the accused that she could avoid a murder prosecution by confessing
to robbery, all the while pressuring her to talk before she had counsel" amounted to

24  "circumstances calculated to undermine the suspect's ability to exercise free will.");  *United
States v. Antone*, No. CR 08-82 TUC DCB (JM), 2008 WL 4905492, at *9 (D. Ariz. Nov. 13,

25  2008) (granting motion to suppress involuntary confession where the suspect was promised that
the charges against him would be limited if he admitted them because the promise "was a

26  specific and tangible promise of leniency and an implied threat of more serious charges if he did
not confess");

1    Petitioner's argument is essentially that his original unwarned statements tainted his later

2    warned statements.  In *Elstad*, the suspect made an initial incriminating statement voluntarily,

3    but without first being given the requisite *Miranda* warnings.  One hour later, he was advised of

4    and waived his *Miranda* rights and executed a written confession.  The Supreme Court

5    concluded that a defendant's voluntary statement which is inadmissible solely on the ground of a

6    *Miranda* violation does not necessarily taint a subsequent voluntary statement.  470 U.S. at 307.

7    Unlike evidence obtained through a Fourth Amendment violation, the *Miranda* presumption

8    does not require that the "fruits [of unlawfully obtained confessions] be discarded as inherently

9    tainted."  *Id.*  The Court focused on the voluntariness of the unwarned statements and reasoned

10   that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere

11   fact that a suspect has made an unwarned admission does not warrant a presumption of

12   compulsion" with respect to the postwarning confession.  *Id.* at 314; *see also Seibert*, 542 U.S. at

13   628 (O'Connor, J. dissenting) ("*Elstad* commands that if [a suspect's] first statement is shown to

14   have been involuntary, the court must examine whether the taint dissipated through the passing

15   of time or a change in circumstances . . . .").  The Court in *Elstad* also stated that the

16   admissibility of the post-*Miranda* statement depends on whether that statement was "voluntarily

17   made."  *Elstad*, 470 U.S. at 309, 318; *see also United States v. Williams*, 435 F.3d 1148, 1153

18   (9th Cir. 2006) ("[U]nder Elstad, if the prewarning statement was voluntary (or if involuntary,

19   the change in time and circumstances dissipated the taint), then the postwarning confession is

20   admissible unless it was involuntarily made despite the *Miranda* warning.").  Thus, under *Elstad*,

21   when a defendant has made a statement without having been given prior *Miranda* warnings, and

22   *Miranda* warnings are then administered, "the admissibility of any subsequent statement should

23   turn . . . solely on whether it is knowingly and voluntarily made."  *Elstad*, 470 U.S. at 309.

24    As set forth above, in his supplemental brief petitioner argues that the police interrogators

25   used an improper "two-step" interrogation procedure, whereby they deliberately interrogated

26   petitioner without giving *Miranda* warnings until he confessed, and then gave the warnings and

39

asked him to confess again.  Dckt. 38 at 2.  Citing *Seibert*, he contends that the mid-stream *Miranda* warnings were "a tactic to circumvent *Miranda*."  *Id.* at 13.

In *Seibert*, a plurality of the justices (comprised of Justices Souter, Stevens, Ginsburg, and Breyer) concluded that whenever a two-stage interview occurs (which involves eliciting an unwarned confession, administering the *Miranda* warnings and obtaining a waiver of *Miranda* rights, and then eliciting a repeated confession), the postwarning statement's admissibility depends on whether the midstream warnings could have been effective enough to accomplish their object given the case's specific facts.  542 U.S. at 611-12.  The plurality focused on several objective factors to determine whether the *Miranda* warning in a given case fulfilled its function of advising the suspect that he or she had "a real choice about giving an admissible statement" during the second stage of the interrogation.  *Id.* at 612.

Justice Kennedy's concurring opinion concluded that the *Elstad* principles should apply unless a *deliberate* two-step strategy is employed, in which case the statements must be excluded unless curative measures are taken (such as a substantial break in time and circumstances between the prewarning statement and the warning, or an additional warning explaining the likely inadmissibility of the prewarning statement).  *Id.* at 622 (Kennedy, J,. concurring).  The dissenting Justices (O'Connor, Rehnquist, Scalia, and Thomas) opined that the voluntariness test from *Elstad* should continue to apply without modification.  *Id.* at 627-28 (O'Connor, J., dissenting).[7]

In *United States v. Williams*, 435 F.3d 1148 (9th Cir. 2006), the Ninth Circuit addressed the implications of *Seibert* and concluded that Justice Kennedy's concurrence was controlling because it is the narrowest grounds with which the majority of the Court could agree.

////

---

[7]  The dissent noted, however, that the fact that the interrogating officer in the second part of an interrogation refers to statements made during the first part of the interrogation may have a bearing on whether the second statement is voluntary.  542 U.S. at 628 (O'Connor, J., dissenting).

1    Accordingly, the Ninth Circuit held that "a trial court must suppress postwarning confessions

2    obtained during a deliberate two-step interrogation where the midstream *Miranda* warning - in

3    light of the objective facts and circumstances - did not effectively apprise the suspect of his

4    rights."[8]  *Id.* at 1157.  In essence, the Circuit instructed that the focus should be on whether the

5    two-step interrogation was deliberately used to undermine the *Miranda* warning and effect

6    (based on objective evidence and any available subjective evidence) and whether the midstream

7    warning adequately and effectively apprised the suspect that he had a genuine choice whether to

8    follow up on his earlier confession.  *Id.* at 1158, 1160.

9        However, because *Seibert* was issued more than three months after petitioner's

10    conviction became final on direct appeal, neither *Seibert* nor *Williams* applies here.  *Trice v.*

11    *Fisher*, ___ S.Ct. ___, No. 10-637, 2011 WL 5335411 (U.S. Nov. 8, 2011) (habeas relief

12    properly denied where state court's adjudication of petitioner's claim predated Supreme Court's

13    decision affecting petitioner's claim); *Bennet v. Terhune*, 265 Fed. Appx. 490, at *2 (9th Cir.

14    2008) (*Seibert* does not apply if it was issued after the time of decision in petitioner's case)[9]; *see*

15    *also Walker v. James*, 116 Fed. Appx. 295, 297, 2004 WL 2496742, 2 (2nd Cir. 2004) ("We note

16    that Supreme Court cases – including *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159

17    L.Ed.2d 643 (2004) – decided after the Appellate Division's decision and the Court of Appeals's

18    denial of leave to appeal do not apply here under AEDPA"); *Smith v. Clark*, No. EDCV 07-908

19    JSL (FFM), 2011 WL 4021123, 6 (C.D. Cal. Aug. 12, 2011) ("the Court finds that, with respect

---

21        [8]  The Court also held in *Williams* that its decision in *United States v. Orso*, 266 F.3d
22    1030 (9th Cir. 2001), which the state appellate court cites, and which held that regardless of the
police tactics used voluntary postwarning inculpatory statements are excluded only when the
prewarning statements were involuntary, was abrogated by *Seibert*.  *Williams*, 435 F.3d at 1161.

23        [9]  In *Bennett*, the Circuit also rejected the claim that even if *Seibert* cannot be applied
24    retroactively, it still sheds light on whether a state application of *Elstad* was objectively
reasonable.  "*Seibert* was a plurality opinion in which four justices of the Court concluded that
25    *Elstad* compelled them to vacate the state Supreme Court's decision excluding a post-Miranda
confession.  We cannot say that [a] state court . . . was 'objectively unreasonable' when, on
26    similar facts, it came to the same conclusion that four justices of the Supreme Court came to in
the later *Seibert* plurality.").  *Bennett,* 265 Fed. Appx. 490, at *2.

to *Seibert*, the Court must look to the date on which the petitioner's conviction became final in determining which Supreme Court precedent to apply . . . ."); *Singleterry v. Schriro*, No. CV-06-2380-PHX-DGC, 2009 WL 536547 (D. Ariz. Mar. 4, 2009) (*Seibert* did not announce a "watershed rule" and could not be retroactively applied); *Davis v. Secretary Dept. of Correction*, No. 8:08-cv-1842-T-33MAP, 2009 WL 3336043 (M.D. Fla. Oct. 15, 2009) (same); *Curtis v. Madison Correctional Inst.*, 2008 WL 918703, at *3 (S.D. Ohio Apr. 2, 2008) ("Even if *Seibert* did constitute a new rule of criminal procedure, it did not constitute a 'watershed rul[e] of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding,' and therefore cannot be applied retroactively"); *Duncan v. Fischer*, 410 F. Supp.2d 101, 110 (E.D.N.Y. 2006) ("Moreover, *Seibert* was decided on June 28, 2004, long after Duncan's conviction became final, and thus is not "clearly established Federal law" properly considered in deciding his petition"); *Vachet v. West*, No. 04-CV-3515JG, 2005 WL 740640, 8 (E.D.N.Y. Mar. 24, 2005) ("*Seibert* was handed down after the Appellate Division's decision, and thus its gloss on *Elstad* was not clearly established at the time of the decision."). *Cf. Thompson v. Runnell*s, 657 F.3d 784, 796 (9th Cir. 2011), *petition for cert. filed*, 80 U.S.L.W. 3196 (U.S. Sept. 7, 2011) (No. 11-305) (court applied *Seibert* to petitioner's habeas claims where petitioner's conviction did not become final until after *Seibert* was decided and petitioner had requested that the California Supreme Court apply the then-pending *Seibert* to his petition for review).[10]

Accordingly, as the *Elstad* court concluded, to determine the admissibility of petitioner's post-*Miranda* statements (which were made after petitioner's unwarned statements), the relevant

---

[10]  Even if, as petitioner argues, the opinion in *Seibert* was dictated by *Elstad*, petitioner would not succeed on a claim based on *Seibert*. The state appellate court concluded that "so far as the record shows, when the officers did (subjectively) believe they had [petitioner] in custody, they *Mirandized* him." That conclusion is sufficiently supported by the state court record. In short, the record in this case does not contain sufficient support for petitioner's argument that the timing of the *Miranda* warnings reflected "a bad faith question first strategy." *See* Dckt. 48 at 18.

1    questions are whether petitioner's pre-*Miranda* statements and his post-*Miranda* statements were

2    voluntary.  As discussed above, the state appellate court's conclusion that petitioner's post-

3    *Miranda* statements were voluntary presented a close call.  But considering all of the factors

4    addressed by the state court, its conclusion was not contrary to or an unreasonable application of

5    clearly established Supreme Court authority, nor was it based on an unreasonable determination

6    of the facts.  Further, as discussed above, petitioner's two hour interrogation (in which petitioner

7    made both his pre-*Miranda* and post-*Miranda* statements) was not coercive.[11]  Because

8    petitioner has not shown that his pre-*Miranda* statements were involuntarily made, he is not

9    entitled to habeas relief on this ground.

10                    **2.  Insufficient Evidence to Support Petitioner's Convictions**

11          Petitioner also contends that there was insufficient evidence to support his convictions for

12   first degree murder, robbery, and the robbery special circumstance because his statements to the

13   investigators, which were admitted at trial, "described an argument which resulted in the use of

14   force on the victim and not the use of force in any effort to take his property."  Dckt. 1 at 8.

15          In rejecting petitioner's claim, the state appellate court reasoned:

16               [When considering the evidence in the light most favorable to the
                 verdict, as required], we see two men in a bar, out of money, who
17               befriend a drunk who is flashing a wad of cash.  They discuss a
                 plan to "roll" the man, then drive him to a quiet road, beat him
18               with a tire iron, take his wallet and drive over him with a truck.
                 The evidence amply supports the jury's findings.
19
                 Defendant asserts he and Wachniuk first killed Howell because of
20               Howell's racist statements, then decided to take Howell's money.
                 The jury was not required to credit [petitioner's] story but could
21               rationally infer that the men killed Howell pursuant to their plan to
                 "roll" him and not because of any offensive comments allegedly
22               made, or conclude they never abandoned the intent to steal, even if

23   _____

24        [11]  Although the conclusion as to voluntariness made in the previous section addressed
     the voluntariness of petitioner's post-*Miranda* statements, in order to reach that conclusion, this
25   court – and the state appellate court – considered the context in which those statements were
     made.  Because the pre-*Miranda* statements were made in the same interrogation as the post-
26   *Miranda* statements, the context in which the pre-*Miranda* statements were made was
     considered.

                                              43

1  they were also enraged by those alleged comments.

2  *Winter II* at 21.

3  The Due Process Clause of the Fourteenth Amendment "protects the accused against

4  conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

5  crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  There is sufficient

6  evidence to support a conviction if, "after viewing the evidence in the light most favorable to the

7  prosecution, any rational trier of fact could have found the essential elements of the crime

8  beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Prantil v.*

9  *California*, 843 F.2d 314, 316 (9th Cir. 1988).  "[T]he dispositive question under *Jackson* is

10  'whether the record evidence could reasonably support a finding of guilt beyond a reasonable

11  doubt.'" *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at

12  318).  A petitioner in a federal habeas corpus proceeding "faces a heavy burden when

13  challenging the sufficiency of the evidence used to obtain a state conviction on federal due

14  process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274, 1275 & n.13 (9th Cir. 2005).  In order

15  to grant the writ, the habeas court must find that the decision of the state court reflected an

16  objectively unreasonable application of *Jackson* and *Winship* to the facts of the case.  *Id.*

17  The court must review the entire record when the sufficiency of the evidence is

18  challenged in habeas proceedings.  *Adamson v. Ricketts*, 758 F.2d 441, 448 n.11 (9th Cir. 1985),

19  *vacated on other grounds*, 789 F.2d 722 (9th Cir. 1986) (en banc), *rev'd*, 483 U.S. 1 (1987).  It is

20  the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw

21  reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.  If the trier

22  of fact could draw conflicting inferences from the evidence, the court in its review will assign

23  the inference that favors conviction. *McMillan v. Gomez*, 19 F.3d 465, 469 (9th Cir. 1994).  The

24  relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether

25  the jury could reasonably arrive at its verdict. *United States v. Mares*, 940 F.2d 455, 458 (9th

26  Cir. 1991); *Roehler v. Borg*, 945 F.2d 303, 306 (9th Cir. 1991).  The federal habeas court

1    determines the sufficiency of the evidence in reference to the substantive elements of the

2    criminal offense as defined by state law.  *Jackson*, 443 U.S. at 324 n.16; *Chein*, 373 F.3d at 983.

3            Viewing the evidence in the light most favorable to the prosecution, there was sufficient

4    evidence from which a reasonable trier of fact could have found beyond a reasonable doubt that

5    petitioner was guilty of first degree murder, robbery, and the robbery special circumstance.

6    Although the defense theory at trial was that petitioner and Wachniuk's argument with the victim

7    led to the victim's death, and not any intent to rob him, as the state appellate court explained the

8    jury was not required to credit that theory.  There was sufficient evidence from which the jury

9    could – and did – determine that petitioner and Wachniuk intended to rob the victim, which

10   included their statements that they intended to "roll" the victim, and that in the process of that

11   robbery petitioner and Wachniuk killed the victim.  Therefore, the state appellate court's analysis

12   of this claim was not contrary to or an unreasonable application of federal law, nor was it based

13   on an unreasonable determination of the facts.  Accordingly, petitioner is not entitled to habeas

14   relief on this ground.

15                          **3.  Jury Instruction Error**

16           In conjunction with petitioner's argument that there was insufficient evidence to support

17   his convictions, petitioner also argues that the trial court erroneously instructed the jury that his

18   intent to deprive the victim of his property had to happen before or at the time that the act of

19   *taking* the property occurred.  Dckt. 1 at 9.  Petitioner contends the jury should have been

20   instructed that petitioner needed to have the requisite intent before or at the time of the

21   application of *force*.  *Id.*  Respondent counters that this claim is based on a purported violation of

22   state law and, to the extent petitioner seeks to characterize the claim as one arising under the

23   federal constitution, the claim is unexhausted.  Ans. at 25.  Respondent further contends that, in

24   any event, the claim fails under state law.  *Id.*

25   ////

26   ////

The state appellate court rejected petitioner's jury instruction claim, reasoning as follows:

> [Petitioner] argues the instructions compelled the jury to convict him of robbery and felony-murder even if the jury believed Howell was not attacked in order to facilitate the taking, i.e., Howell was attacked because of his offensive statements, and [petitioner] and Wachniuk *then* decided to take his money.

> The trial court gave proper instructions on this point and the arguments of counsel in the trial court focused the jury's attention on the correct principles. We presume the jurors understood and correlated the instructions. (*People v. Powell* (1960) 186 Cal.App.2d 54, 59.)

> The jury was instructed (CALJIC No. 8.10) that in order to return a first degree murder verdict, it had to find the killing "was done with malice aforethought or occurred during the commission of Robbery." The jury was also instructed (CALJIC No. 8.21) that the killing "during the commission or attempted commission of Robbery is murder of the first degree when the perpetrator had the specific intent to commit that crime [i.e., robbery]."

> The standard robbery definition (CALJIC No. 9.40) was given, stating the taking must be against the will of the victim, meaning "without consent." CALJIC No. 9.40.2, given in this case, provides: "To constitute the crime of robbery, the perpetrator must have formed the specific intent to permanently deprive an owner of his property before or at the time that the act of taking the property occurred. If this intent was not formed until after the property was taken from the person or immediate presence of the victim, the crime of robbery has not been committed."

> The robbery-murder special circumstance instruction (CALJIC No. 8.81.17) required the jury to find that the killing "was committed while the [petitioner] was engaged in . . . the commission of a Robbery" *and* that the killing "was committed in order to carry out or advance the commission of the . . . Robbery or to facilitate the escape therefrom or to avoid detection. . . . [T]he special circumstance . . . is not established if the Robbery was merely incidental to the commission of the murder."

> In the discussion before the jury was instructed, [petitioner's] trial counsel came up with the theory that although there was evidence of preplanning ("Let's roll this guy"), the taking may not have been through force or fear because the fight may have been triggered by racial epithets ("peckerwood") before any demand for money was made, and the actual taking took place after the victim was dead, when Wachniuk lifted the wallet. She acknowledged this argument was "thin," but argued it was substantial enough to present to the jury.

Defense counsel *agreed* to the giving of CALJIC No. 9.40.2, in the language of this passage which we have italicized: "I believe it would be error to not instruct on the lesser of theft.  [¶] I think that's particularly important, your Honor, in light of the language in CALJIC nine point four oh point two, *which we agree will be given*, which talks about specific intent to permanently deprive an owner of his property before or at the time of the act of taking."  The parties also discussed *People v. McGrath* (1976) 62 Cal.App.3d 82, in which we concluded (at pages 86 to 88) taking money from a dead victim is still grand theft (theft from a person) if the intent to steal preceded the victim's death, such that the killing and taking are "one continuous transaction."  The trial judge decided to give the lesser theft instruction, "appreciating that it is

[an] extremely weak evidentiary basis . . . but I'm going to let the jury sort it out."

Accordingly, the jury was instructed (CALJIC No. 14.02) that it could return a guilty verdict on the lesser offense of grand theft, but if and only if the specific intent to take the property "arose after the application of force upon the victim[.]"

In argument to the jury the prosecutor noted [petitioner] made deliberately misleading statements to the officers and destroyed evidence after the crime, both tending to inculpate him and negate his fantastic story of taking-as-an-afterthought and accidentally running over Howell.  The motive, financial gain, was obvious, given [petitioner's] lack of money earlier that evening, the victim's unfortunate choice to display his money, and [petitioner's] new-found wealth, which he and Wachniuk largely squandered on liquor at the Bell Lounge.

The defense tried to raise a doubt about the accidental use of the truck (and succeeded, given the not true finding on the second weapon enhancement).  The defense also argued there was no intent to rob at the time of application of force, and conceded [petitioner] had committed a grand theft, arguing the jury should use the grand theft to find *second degree* murder.  This was a wise strategy given those facts which were not contested.

The prosecutor in reply pointed to the two instructions on the timing of intent, first CALJIC No. 9.40.2, arguing that the [petitioner] already talked about a robbery (to "roll" the victim): "They talked about it.  They got the money; the victim doesn't have the money.  He's beat up.  What . . . logical inference can you draw?  [¶]  That he was taken out there, beaten up and robbed."  The prosecutor also pointed to the grand theft instruction: "The other one is the specific intent to permanently deprive the alleged owner of his property only arose after the application of force upon the victim.  So what she [defense counsel] wants you to believe

1
2
3
4
5

was Gee, we were going to go out there and rob him but somewhere between there and the dump we decided not to and then he got mouthy and gee, we had to take him down because he was being a mouth and he was being obnoxious . . . ."  He argued: "They went out there to rob him and they did rob him.  [¶]  Her scenario is unreasonable and you should reject it."  Thus the prosecutor did not disagree with the defense point about the *legal standard*, he disagreed *on the facts*, as shown by reasonable inferences from the evidence.

6
7
8
9

On appeal [petitioner] faults the instructions for not focusing on the time of *force* but instead on the time of *taking*.  But at trial the parties agreed this point would be dealt with in a modified grand theft instruction (CALJIC No. 14.02), rather than as an amendment to CALJIC No. 9.40.2.  Further, the jury was instructed that robbery requires that property be taken by force or fear with the specific intent permanently to deprive that person of the property.

10
11
12
13
14
15
16

Under the instructions and arguments of counsel, if the jury believed the intent to take arose after the application of force, it would not have convicted [petitioner] of robbery (and, hence, first degree murder) because the instructions required the jury to find the intent to take arose before or at the time of taking.  If the jury agreed – factually – that the taking was an afterthought to the application of force in response to alleged racist comments, it would have convicted of grand theft and second-degree murder.  No instructional error took place, the jury simply did not find the imaginative defense theory raised a reasonable doubt on the more serious charges of robbery and first degree murder, and the robbery-murder special circumstance.

17  *Winter II* at 22-27.

18       In general, a challenge to jury instructions does not state a federal constitutional claim.

19  *Engle v. Isaac*, 456 U.S. 107, 119 (1982); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir.

20  1983).  In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely

21  'undesirable, erroneous, or even "universally condemned,"' but must violate some due process

22  right guaranteed by the fourteenth amendment."  *Prantil v. California*, 843 F.2d 314, 317 (9th

23  Cir. 1988) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)).  To prevail on such a claim

24  petitioner must demonstrate "that an erroneous instruction 'so infected the entire trial that the

25  resulting conviction violates due process.'"  *Prantil*, 843 F.2d at 317 (quoting *Darnell v.

26  *Swinney*, 823 F.2d 299, 301 (9th Cir. 1987)).  In making its determination, this court must

48

1   evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a

2   component of the entire trial process.'" *Id.* (quoting *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th

3   Cir. 1984)). The analysis for determining whether a trial is "so infected with unfairness" as to

4   rise to the level of a due process violation is similar to the analysis used in determining, under

5   *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), whether an error had "a substantial and

6   injurious effect" on the outcome. *See Thomas v. Hubbard*, 273 F.3d 1164, 1179 (9th Cir. 2001),

7   *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815, 828 n.11 (9th Cir. 2002).

8       As noted above, respondent argues that petitioner raised only a state law claim in his

9   petition for review in the California Supreme Court and that any federal due process claim is

10  unexhausted. Dckt. No. 8 at 30. Assuming arguendo that petitioner is raising an unexhausted

11  federal due process claim, this court recommends that it be denied on the merits. *See* 28 U.S.C.

12  § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits,

13  notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the

14  State"). Petitioner has not shown that the jury instructions given at his trial rendered his trial

15  fundamentally unfair or that the state court's rejection of this claim was contrary to or an

16  unreasonable application of federal law. Accordingly, petitioner is not entitled to habeas relief.

17  **IV. Conclusion**

18      For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

19  application for a writ of habeas corpus be denied.

20      These findings and recommendations are submitted to the United States District Judge

21  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one

22  days after being served with these findings and recommendations, any party may file written

23  objections with the court and serve a copy on all parties. Such a document should be captioned

24  "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections

25  within the specified time may waive the right to appeal the District Court's order. *Turner v.*

26  *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In

his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case. *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  April 9, 2012.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE